der of reversal, with costs of the appeal to the appellants to abide the event.

Decree of the surrogate's court reversed, and new trial ordered, upon the issues between the parties, before a jury at a trial term of the supreme court, to be held in Franklin county, with costs to appellants to abide event; the order to contain the following questions of fact to be tried by the jury: First: Was the instrument dated April 2, 1898, duly signed, published, and executed by Mary A. Campbell as her last will and testament? Second: If the same was so executed, was she of sound mind and memory, and competent to execute the same? Third: Was the execution of the same procured by the fraud, restraint, or undue influence of Norman Cushman? Fourth: Were the provisions in said will, other than those in favor of Norman Cushman, procured by undue influence?

All concur; SMITH, J., in result.

---

(36 Misc. Rep. 450.)

AMERICAN NOVELTY & MFG. CO. v. MANUFACTURING ELECTRICAL NOVELTY CO. et al.

(Supreme Court, Special Term, New York County.    December, 1901.)

INJUNCTION—USE OF CORPORATE NAME—FRAUD.

A new corporation, calling itself the "Manufacturing Electrical Novelty Company," sent out circulars stating that it had been in business for three years, and had distributed its goods through an agent, but that thereafter it proposed to deal directly with its customers. The circular thanked the persons addressed for favors received, and stated that the corporation was composed in part of former employés of a corporation known to the trade as the "American Novelty" or "Electrical Novelty Company," which had been engaged in manufacturing similar goods. The circulars falsely stated the place of manufacture to be in part at the same street number as that of the last-named company. It was shown that the circulars had deceived the customers of the latter company. Held, that the use of the name "The Manufacturing Electrical Novelty Company" would be restrained, as calculated to deceive the public.

Suit by the American Novelty & Manufacturing Company against the Manufacturing Electrical Novelty Company and others. Injunction granted.

Maurice Rapp and William N. Cohen, for plaintiff.
Booth & Deane, for defendants.

LAWRENCE, J. This is a motion to restrain the defendants, their officers, directors, clerks, attorneys, agents, and servants, during the pendency of the action from selling or offering to sell, under the name of the "Manufacturing Electrical Novelty Company," certain electrical goods, or electrical novelties, similar to those manufactured by the plaintiff, and from circulating circulars, copies of which are annexed to the complaint, or any circulars similar thereto, or containing substantially the same or any other false representations, and from pretending that the electrical novelties manufactured by the defendants have been manufactured by them, or any of them, for the past three years, or for any time except since September, 1901; also from representing themselves, or any of them, as having

sold to the public electrical novelties during the past three years, or through an agent, and from pretending or representing that they have any connection, directly or indirectly, with the plaintiff, and from manufacturing electrical batteries by a certain secret process, which belongs to the plaintiff, and referred to in the complaint, or from selling the same, or from manufacturing or selling electrical batteries similar to the plaintiff's batteries, or selling electrical goods containing such batteries; and for such other and further relief as may seem just. The plaintiff is a domestic corporation organized March 11, 1898, and since that time has been continuously engaged in manufacturing and selling certain electrical novelties. Since February 1, 1899, its principal office and factory has been at No. 255 Centre street, in this city, and it has largely advertised its goods, and has employed sales agents, by means of which it has an extensive business throughout the United States, with branch offices in Chicago and Canada, and agencies in Europe, Japan, Canada, Australia, San Francisco, Mexico, and Massachusetts. The goods which it manufactures are illustrated in its catalogue, which is annexed to the complaint. Plaintiff's affidavit shows that the company is known as the "American Novelty" or "Electrical Novelty Company," and that mail addressed in that way has, until recently, always been delivered to the plaintiff at its office and place of business No. 255 Centre street; that in June, 1898, the defendant George Stein and one William V. Langlos were copartners under the firm name of Stein & Langlos, conducting a small repair shop near plaintiff's place of business, and obtained work from plaintiff in manufacturing certain parts of its electrical goods on a small scale. In January, 1899, that firm and the plaintiff entered into a written agreement whereby the firm was to work exclusively for plaintiff, and the said firm became a tenant of the plaintiff at its factory No. 255 Centre street from that time until about August, 1901, during which time the plaintiff paid said firm sums of money amounting to over $50,000. It is also alleged that during all this time from August 15, 1899, and extending over a period of nearly two years, the defendant Leopold Pollock was in the employ of the plaintiff as its shipping clerk, and that during the course of his employment Pollock became acquainted with the plaintiff's manner of doing business, and the terms on which it was selling its goods, the names and addresses of its customers and the prices at which the plaintiff was selling its goods to them, the discounts which it was in the habit of allowing to such customers; and that the plaintiff found that in July or August, 1899, Pollock and Stein and the defendant Kabisch were frequently conferring with each other, and that the plaintiff's manager, upon demanding an explanation from Pollock, obtained a confession from Pollock that he expected to go into a combination with the other defendants to compete with the plaintiff, and thereupon plaintiff dispensed with his services. It is also alleged that the plaintiff, in its electrical goods, uses a battery which is put together by a secret process, and that Pollock obtained this secret process by pretending to the plaintiff's manager that he desired to experiment with it, and obtain an improvement in such process, and in that way induced Hubert to impart

this secret to him, he (Pollock) promising to let the plaintiff have the benefit of any of his experiments or improvements. It is further alleged that in February, 1901, the said firm of Stein & Langlos and the defendant Kabisch formed a domestic corporation under the name of the Stein & Langlos Electric Manufacturing Company; that subsequently Stein induced Langlos to sell a portion of his shares, so that ultimately Stein acquired 51 shares of the corporate stock of that company, and obtained control of it; that, after Pollock severed his connection with the plaintiff, he associated himself with Stein and Kabisch, and took with him a list of plaintiff's customers' addresses, and all other information that he had collected while in plaintiff's employ, together with the secret process, and thereupon these three defendants, Pollock, Stein, and Kabisch, organized a business which they called the "Manufacturing Electric Novelty Company, Incorporated," at No. 216 Centre street; that they thereupon began and manufactured the batteries which were to be used in the electrical goods of the defendants, which are similar in every respect to plaintiff's goods, although the defendants never manufactured batteries before, and did not know how to manufacture them, and would not have known how to have done so only for the knowledge obtained by Pollock in the plaintiff's employ, etc.; that in August, 1901, the defendant Stein, ascertaining that Langlos would not enter into the alleged conspiracy against the plaintiff, tried to get him to sell his stock to Stein, and, when Langlos refused, Stein prevented him from entering the factory of the company, although Langlos was the vice president and a director thereof; that on September 10, 1901, the Manufacturing Electrical Novelty Company was incorporated by the said Stein and said Pollock and one Booth, who is the legal adviser of Stein, Stein subscribing for 79 out of the 100 shares of the capital stock, and Pollock 20 shares, and Booth for one share. On September 15, 1901, the Stein & Langlos. Company removed from the premises No. 255 Centre street, and has had no connection with those premises since that time, and that said Manufacturing Electrical Novelty Company never had any office or factory in the premises No. 255 Centre street, and that none of the defendants has had any connection with the said premises since September 15, 1901. It is further alleged in the plaintiff's moving papers, that subsequently the defendant sent out circulars, the heading of which is "The Manufacturing Electrical Novelty Company, Manufacturers of Electrical Novelties, Portable House Lights, Dry Batteries, and Miniature Lamps, No. 216 Centre Street, New York. Factories No. 255 Centre Street and No. 6 Howard Street." In that circular it is stated that the Manufacturing Electrical Novelty Company has been manufacturing electrical novelties "for the past three years, and, having heretofore distributed these goods to you, as well as to all our other clients, through an agent, we propose henceforth to deal direct with you ourselves in the future, which we believe you will agree with us will be to our mutual advantage and profit," etc. The circular further states that the descriptive catalogue, with discount sheet, is now in press, and copies will be mailed to the person addressed in two weeks or so; and, "after careful and exhaustive

experiments, we have so far improved our dry batteries as to enable us to guaranty you 30 per cent. more life and light than any at present on the market," etc. The circular then goes on to state that, "Your familiarity with our line makes it unnecessary to say anything further at this time than to call your attention to the fact that in our line we have forty different articles finished in some sixty various styles." The catalogue referred to is annexed to the complaint, and marked "Exhibit C."

Many of the allegations in plaintiff's moving papers are denied by the defendants, the defendant Pollock denying that he ever obtained any secret process while in the plaintiff's employ, or that he ever obtained and delivered to Stein and Langlos or to the defendant company the names of the plaintiff's customers. It is a very significant fact, however, that the circulars to which attention has just been called, and which have been sent out, as shown by plaintiff's affidavit, very extensively, referred to the fact that the defendant company has during the past three years distributed the goods in said circulars referred to to the party addressed, through an agent, and that the company proposes henceforth to deal directly with the person so addressed. This circular is certainly calculated to cause the persons receiving it, from the similarity in the names of the two corporations, to believe that it emanates from the plaintiff corporation, and is also calculated thus unfairly to deprive the plaintiff of some of its customers; and the affidavits read on the part of the plaintiff show that some of such customers and some of its agents have been led by such circulars to believe that the plaintiff company is either amalgamated with the defendant company, or sold out to it, and gone out of business itself. In addition to what has been stated in regard to the contents of the circulars, it will be observed that the defendant company thanks the person addressed in advance for a continuance of his favors, thereby leaving the person addressed to believe that the circular emanates from the plaintiff. The denials of the defendants' affidavits do not meet this phase of the case which is presented by plaintiff, and no one, I think, who has read the affidavits presented on both sides, can fail to come to the conclusion that it has been the design of the defendant company and of the other defendants to lead those who have heretofore treated with the plaintiff to believe the two companies are one and the same, or that the defendant company has succeeded the plaintiff company, and thus to deprive the plaintiff of its business and to deceive the public. This I look upon as the crucial point in the case, and the defendants are not, therefore, entitled to invoke the elementary rule that, where all the equities are denied, an injunction will not be granted. I have therefore reached the conclusion that the case comes within the principle enunciated by the court of appeals in the case of Charles S. Higgins Co. v. Higgins Soap Co., 144 N. Y. 462, 39 N. E. 490, 27 L. R. A. 42, 43 Am. St. Rep. 769, in which it was held that an exclusive right may be acquired in the name in which a business has been carried on, whether that be a partnership or an individual, and it will be protected against infringement by another who has assumed it for the purpose of deception, or

without right, even innocently, to the detriment of the one who has used it. The opinion of Chief Judge Andrews is so full and explicit that it is unnecessary to add further than to refer to it and the cases cited by the learned judge. It therefore follows that the plaintiff is entitled to an injunction restraining the defendants from using the name adopted by them, or issuing or using the circulars mentioned in the moving papers, and from in any way holding themselves out as the successors of the plaintiff, or as in any way connected, either now or heretofore, in business with the plaintiff. I shall require the plaintiff to give an undertaking in the sum of $5,000.

Ordered accordingly.